AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Middle District of Alabama

In the Matter of the Search of  )
*(Briefly describe the property to be searched*  )
*or identify the person by name and address)*  )   Case No. 1:18mj141-TFM
)
SEE ATTACHMENT A  )
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____ Middle _____ District of _____ Alabama _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) & 843(b) | Controlled Substances Act |

The application is based on these facts:
See attached Affidavit incorporated herein by reference and made part of this application.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Donald M. VanHoose, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 6, 2018 @ 1517

*Judge's signature*

City and state: Montgomery, AL   TERRY F. MOORER, U.S. MAGISTRATE JUDGE
*Printed name and title*

## ATTACHMENT A

The property to be searched is a Samsung cellular phone, model SM-J327T1, International Mobile Equipment Identity ("IMEI") number 352001/09/103197/3 (hereinafter "Device-1"). Device-1 is currently located in evidence at the FBI's Dothan Resident Agency, located at 2999 Ross Clark Circle, Dothan, Alabama 36301.

This warrant authorizes the forensic examination of Device-1 for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on Device-1 described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 843(b), and involve Rogelio Israel Pimentel and Santos Rivera-Fernandez, from Jan. 1, 2017 to November 1, 2017, including:

   a. Electronic communications between Rogelio Israel Pimentel, Santos Rivera-Fernandez, Jose Alberto Jesus Rubalcava, the FBI Undercover Employee (UCE), or any other co-conspirator;

   b. lists of customers and related identifying information;

   c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   d. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   e. any information recording Rogelio Israel Pimentel and Santos Rivera-Fernandez's schedule or travel; and

   f. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned Device-1 at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

   a. records of Internet Protocol addresses used; and

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A SAMSUNG CELL PHONE WITH IMEI 352001/09/103197/3 (DEVICE-1), CURRENTLY LOCATED IN EVIDENCE AT THE FBI'S DOTHAN RESIDENT AGENCY, DOTHAN, ALABAMA | Case No. 1:18mj141-TFM |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Donald M. VanHoose, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since August 2004. I have been assigned to the Miami and Mobile Divisions and have investigated numerous types of federal crimes, to include violations of Title 21, United States Code, Sections 841(a)(1) and 843(b). During my tenure, I have received specialized training in narcotics trafficking and I have actively participated in numerous investigations related to narcotics. In these investigations, consensual recordings of both phone calls and text messages made by informants, the review of historical phone records, physical surveillance, search warrants, the controlled purchase of narcotics, and Title-III intercepts were utilized as investigative techniques. Additionally, I have executed search warrants, monitored Title-III

intercepts, applied for and received authorization to conduct Title-III intercepts, reviewed the consensual recording of both phone calls and text messages, participated in the controlled purchase of narcotics, applied for historical phone records, and reviewed those records, participated in records checks, participated in physical surveillance, and participated in numerous interviews with informants and cooperative subjects engaged in illegal drug activity. I have participated in, and conducted investigations involving the transmission of controlled substances and/or the proceeds from the sale of controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 843(b). This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

3. The property to be searched is a Samsung cellular phone, model SM-J327T1, International Mobile Equipment Identity ("IMEI")[1] number 352001/09/103197/3 (hereinafter "Device-1"). Device-1 is currently located in evidence at the FBI's Dothan Resident Agency, located at 2999 Ross Clark Circle, Dothan, Alabama 36301.

4. The applied-for warrant would authorize the forensic examination of Device-1 for the purpose of identifying electronically stored data particularly described in Attachment B.

---

[1] An IMEI or International Mobile Equipment Identity is a unique identification number embedded in a wireless phone by the manufacturer.

## PROBABLE CAUSE

5. In March 2017, the FBI initiated a court authorized wire intercept of a cell phone used by Bryant Dewayne Pouncy (hereinafter "Pouncy"). The subsequent investigation identified that Pouncy's source of supply for methamphetamine was Jose Alberto Jesus Rubalcava (hereinafter "Rubalcava"). Rubalcava is a United States citizen who permanently resides in Mexico.

6. In May 2017, an FBI Confidential Human Source introduced an FBI Undercover Employee (hereinafter "UCE") to Rubalcava. The UCE posed as a potential drug distributor. On May 24, 2017, Rubalcava contacted the UCE using a Mexico based telephone number. During their conversation, Rubalcava offered to sell the UCE one kilogram of methamphetamine for $10,500. Rubalcava further explained that the UCE would need to travel to the Atlanta area to conduct each transaction. The UCE ultimately setup four controlled deliveries from June 2017 to October 2017 as detailed below.

7. For the first delivery, the UCE arranged to purchase one kilogram of methamphetamine for $10,500. This arrangement was setup over a series of recorded communications with Rubalcava. On June 1, 2017, the UCE traveled to the Atlanta area to conduct the transaction. On the day of the transaction, Rubalcava provided the UCE with a phone number to call, along with a "code" word. The code word was "Alazan."[2] Eventually, the UCE met with an unknown Hispanic male and successfully conducted the transaction as arranged. Surveillance units were unable to positively identify the Hispanic male.

---

[2] It should be noted that "Alazan" was the same code word utilized by Pouncy when he arranged purchases of methamphetamine.

8.  For the second delivery, the UCE again arranged for a purchase of one kilogram of methamphetamine for $10,500. This arrangement was also made over a series of recorded communications with Rubalcava. On July 27, 2017, the UCE traveled to the Atlanta area to conduct the transaction. On the day of the transaction, Rubalcava provided the UCE with another phone number to call, and a new "code" word. The UCE called the number provided by Rubalcava and provided the code word, "Lacho." Consistent with the June 1, 2017 transaction, the UCE met with an unknown Hispanic male to complete the transaction. While surveillance units were unable to positively identify the Hispanic male, they were successful in identifying a vehicle and residence.

9.  The UCE arranged the third delivery for the same amount, one kilogram of methamphetamine for $10,500, through more recorded communications with Rubalcava. On August 23, 2017, the UCE traveled to the Atlanta area to conduct the transaction. Similar to the two other transactions, on the day of the transaction, Rubalcava provided the UCE with a phone number to call, along with a "code" word. The UCE called the telephone number provided by Rubalcava and provided the code word, "Talacho." Afterwards, the UCE met with an unknown Hispanic male and conducted the transaction. Following the transaction, a traffic stop was made by a member of the Georgia State Patrol to identify the distributor. Once the subject was identified, he was released with a warning for the traffic violation.

10. A fourth transaction was arranged with Rubalcava. During this transaction, the UCE was to obtain significantly more, four kilograms of methamphetamine for $40,000. On October 4, 2017, the UCE traveled to the Atlanta area to conduct the transaction. On the day of the transaction, Rubalcava provided the UCE with a phone number to call and a "code" word.

The UCE called the number provided, (678) 531-5475, and provided the specified code word, "Guero." The phone conversation consisted of the following:

| | |
|---|---|
| DISTRIBUTOR: | Hello. |
| UCE: | Hey man, I'm calling on behalf of Guero. |
| DISTRIBUTOR: | Yeah. |
| UCE: | Hey and uh… did he give you the address or do you need me to text it to you? |
| MALE | Yeah, he didn't… he didn't give it to me. Where are you located? |
| UCE: | I'm right off 285, I'm at the Howard Johnson across from Exit 60. |
| DISTRIBUTOR: | 60? Is that 85… or wait…. |
| UCE: | No, 285… the loop. Exit 60, it's in College Park. |
| DISTRIBUTOR: | College Park. |
| UCE: | Yeah, I'll text you the hotel address. I just checked out. I walked out to my car, I'm sitting in it. |
| DISTRIBUTOR: | Alright. |
| UCE: | I'm in a… I'm parked… I'm on the side of the hotel in a black Mercedes with Florida plates. |
| DISTRIBUTOR: | Alright…. |
| UCE: | Okay. |
| DISTRIBUTOR: | Well, I've got to see how far you are from me. |
| UCE: | Well man I…. I understand, you know, things get mixed up and that but he said y'all would be here before four. I've got to get back to Florida |

5

|  |  |
|---|---|
|  | before 8 pm tonight. I'm already going to be late so, I mean, I've got to go. |
| DISTRIBUTOR: | Alright. |
| UCE: | Let me text it to you and shoot me back a text and let me know how far out y'all are, okay? |
| DISTRIBUTOR: | Alright. Alright. |
| UCE: | Thanks, bye. |

11. Following the above phone conversation, the UCE and the distributor sent the following text messages:

| UCE: | Howard Johnson 1551 Pheonix Blvd College park GA. It's off Exit 60 I-285 Black Mercedes |
|---|---|
| DISTRIBUTOR: | 20 min |
| UCE: | U close bro? |
| DISTRIBUTOR: | 5 |

12. The final call between the UCE and the distributor consisted of the following:

| UCE: | Hey buddy. |
|---|---|
| DISTRIBUTOR: | Yeah. |
| UCE: | You out here? |
| DISTRIBUTOR: | I'm by the Mercedes. |

UCE: Alright, I'm coming. I'm coming out the lobby. Be there in a minute. Bye.

13. Consistent with the above communications, surveillance units observed a red Chevrolet Camaro arrive at the Howard Johnson hotel and park next to the UCE's black Mercedes. Then the driver and the front seat passenger both got out of the vehicle and changed seats. At that time, the Clayton County (Georgia) Sheriff's Department arrested both subjects. Inside the Chevrolet Camaro, officers saw, and later obtained, four kilograms of methamphetamine near the front seats. The two subjects were identified as Rogelio Israel Pimentel (hereinafter "Pimentel") and Santos Rivera-Fernandez (hereinafter "Fernandez"), and both men were charged with narcotics related felony offenses in Georgia state court.

14. At the time of their arrest, Pimentel was in possession of Device-1, and Rivera was in possession of Device-2, as well as a second cellular phone. Both Device-1 and Device-2 appear new, with no observable damage or marks on either. Additionally, both Device-1 and Device-2 are the same Samsung model, SM-J327T1. However, the two devices have different International Mobile Equipment Identity ("IMEI") numbers: Device-1 has IMEI number 352001/09/103197/3, and Device-2 has IMEI number 359617/08/561390/7.

15. Both Device-1 and 2 were processed as evidence and maintained by the Clayton County Sheriff's Office without any further examination. On May 23, 2018, the FBI took custody of Device-1 and Device-2 from the Clayton County (Georgia) Sheriff's Office, and now the Devices are currently in evidence storage at the FBI's Dothan Resident Agency, located at 2999 Ross Clark Circle, Dothan, Alabama 36301.

16. In my training and experience, I know that Devices-1 and 2 have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into the possession of the Clayton County (Georgia) Sheriff.

17. On or about January 10, 2018, Pimentel and Fernandez, along with Pouncy, Rubalcava, and other co-defendants, were all indicted in the Middle District of Alabama for violation of Title 21, United States Code, Section 846 (Conspiracy to Distribute a Controlled Substance).

## TECHNICAL TERMS

18. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This

10

removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

19. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications, which are available online at https://www.samsung.com/us/mobile/phones/all-other-phones/galaxy-j3-prime--metro-pcs--sm-

11

j327tzkatmk/?redir=sm-j327t1, I know that Device-1 has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and have access to the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

20. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

21. There is probable cause to believe that things that were once stored on the device may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" an electronic file, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, electronic storage media—in particular, the internal hard drives—contain electronic evidence of how the device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

22.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how Device-1 was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on Device-1 because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Device-1 consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

24. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize the execution of the warrant at any time in the day or night.

## CONCLUSION

25. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Device-1 described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Special Agent Donald M. VanHoose
Federal Bureau of Investigation

Subscribed and sworn to before me
on June 6, 2018

TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE